# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,
NATIONWIDE MUTUAL INSURANCE
COMPANY,**
<b>Plaintiffs,</b>

**-vs-**                                   **Case No.  6:06-cv-1695-Orl-31KRS**

**HARDIN J. ROYALL, JR., et al,**
<b>Defendants.</b>
_____

# ORDER

      This cause came before the Court upon consideration of the following cross-motions for

summary judgment:  Plaintiffs' Motion for Summary Judgment (Doc. 55) filed by Nationwide

Mutual Fire Insurance Company and Nationwide Mutual Insurance Company (collectively

"Plaintiffs" or "Nationwide"), Defendants' response in opposition thereto (Doc. 66) filed by

Riverfront Equities Realty, Inc., Riverfront Equities, Inc., Hardin J. Royall, III, Hardin J. Royall,

Jr., Royall Construction of Central Florida, Inc., and Royall Construction of Florida I, Inc.

(collectively "Defendants"), certain Defendants' Motions for Partial Summary Judgment (Docs. 53

and 54) filed by Hardin J. Royall, Jr., Royall Construction of Central Florida, Inc., and Royall

Construction of Florida I, Inc., and Nationwide's response in opposition thereto (Docs. 68 and 70).

Oral argument on the preceding motions was held on September 18, 2008.

## I. Background

Nationwide, the Defendants' general commercial liability insurer, brought this action for declaratory relief to determine whether it has a duty to defend and a duty to indemnify its insureds in an underlying action filed in State court.  Nationwide's insureds include Riverfront Equities Realty, Inc. and Riverfront Equities, Inc. (collectively "Riverfront" or the "Riverfront Entities"), as well as Royall Construction of Central Florida, Inc. and Royall Construction of Florida I, Inc. (collectively "Royall Construction" or the "Royall Construction Entities") (Doc. 42, Ex. A-1 through D).

Prior to bringing the instant action, Nationwide agreed to defend Riverfront and Royall Construction in the underlying action pursuant to a reservation of rights.[1]  While Riverfront reached a settlement with the underlying plaintiffs and has been dismissed from the underlying action, Royall Construction still remains a defendant which Nationwide continues to defend.

In addition to seeking a judgment that it has no duty to defend or indemnify its insureds, Nationwide's Motion for Summary Judgment also seeks reimbursement for attorneys' fees and costs which have been expended in the underlying action since March 28, 2006.[2]

---

[1]As discussed further, *infra*, however, Nationwide sent three separate reservation of rights letters to the Defendants.  Nationwide's first reservation of rights was provided to Defendants on or about November 8, 2005 (Doc. 53, Exs. A and B).  However, on January 6, 2006, Nationwide sent a second letter to Defendants, advising them that it had retained counsel to represent them in the underlying action(Doc. 53, Ex. C).  Finally, on March 28, 2006, Nationwide sent yet another letter to Defendants in which Nationwide  not only re-asserted its reservation of rights but also asserted, for the first time, that it had the right to be reimbursed for fees and costs spent in the defense of the underlying action if there was no duty to defend. (Doc. 53, Ex. D).

[2]While Nationwide's Motion for Summary Judgment is silent as to the time frame in which it seeks reimbursement for fees and costs, counsel for Nationwide  stipulated  during oral argument that the relevant time period begins on March 28, 2006, the date of Nationwide's third reservation of

Defendants' Motions for Partial Summary Judgment (Docs. 53 and 54) seek a judgment that Nationwide has a duty to defend the underlying action and that, even assuming Nationwide does not have a duty to defend, the Defendants are under no obligation to reimburse Nationwide for the attorneys' fees and costs spent in defense of the underlying action on their behalf (*See* Doc. 54).

After reviewing the allegations set out in the underlying complaint and the relevant provisions of the policies of insurance, the Court addresses Nationwide's duty to defend and its right to be reimbursed for fees and costs, *infra*.  The Court has jurisdiction pursuant to 28 U.S.C. § 1332 and the parties agree that Florida substantive law is controlling.

**A.  The Underlying Action**

On October 11, 2005, Emerald Beach Resort, LLC, Buffalo Investments, LLC, Bythebridge LLC, and James C. Lee, III (the "Underlying Plaintiffs") brought suit in State court and asserted the following claims against Nationwide's insureds:[3]

- Accounting
- Breach of Fiduciary Duty
- Unjust Enrichment
- Money Had and Received
- Constructive Trust
- Negligence/Wantonness
- Conspiracy
- Declaratory and Injunctive Relief
- Conversion

———————————

rights.

[3]The Underlying Plaintiffs also asserted various securities claims against Jay Royall in his individual capacity (*See* Doc. 42, Ex. F), but those claims are not pertinent here.

According to the Second Amended Complaint, the foregoing claims arose out of a nebulous series of improper transactions and self-dealing on the part of Jay Royall and certain entities which either he or his son, Joe Royall, controlled (*See* Doc. 42, Ex. F at 5-18).  In short, Jay and Joe Royall allegedly used these entities to bilk James Lee ("Lee") out of hundreds of thousands – if not millions – of dollars in connection with the development of certain condominium and town home projects in Panama City Beach and a related development planned for the Orlando area.  *Id*.

### 1.  Underlying Allegations Concerning the Construction of The Emerald Beach Resort

The underlying parties' relationship began in 2002 when Jay Royall first approached Lee about investing in a Panama City Beach development, Emerald Beach Resort.  *Id*. at 6. Representing that he would oversee and manage the construction, financing, and marketing of the Emerald Beach Resort, Jay Royall secured Lee's financial backing for the project.  *Id*.  Jay Royall and Lee then formed Emerald Beach Resort, LLC ("EBR") to, *inter alia*, acquire the property upon which the resort was to be developed.  *Id*.  Through Buffalo Investments, LLC, Lee took a 50% ownership interest and 51% voting interest in EBR, with Jay Royall, through Interlude Investments, LLC, taking a 50% ownership interest and 49% voting interest.  *Id*.

After the formation of EBR, Jay Royall then entered into a joint venture to construct the first condominium tower for the development.  *Id*. at 9.  This joint venture was comprised of Royall Construction of Florida I, Inc. (an entity owned and controlled by Jay Royall and a Nationwide insured) and DooleyMack Constructors, Inc. (a legitimate third-party involved in the general contractor business)  *Id*.  Jay Royall, on behalf of EBR, then executed a construction

agreement between EBR and the Royall Construction-DooleyMack joint venture. *Id.* Notwithstanding his majority voting interest in EBR, Lee was not privy to the details of the joint venture or the fact that EBR had entered into a construction agreement with the joint venture. *Id.* Lee appears to have believed that DooleyMack – and not the joint venture – would be responsible for the construction of the first tower. *Id.* Unbeknownst to Lee, Jay Royall was using the joint venture as an artifice to divert funds from EBR, which were supposed to be used on construction, to Jay Royalls' own entities. *Id.*

Apparently building on the success of his initial scheme, Jay Royall created another joint venture to construct the third tower.[4] *Id.* at 10. Rather than retain DooleyMack Construction, Inc., however, the joint venture on the third tower was between Royall Construction of Florida I, Inc. and Gunther-Nash (another legitimate third-party involved in the general contractor business). *Id.* at 11. Lee, again, was kept in the dark about the nature of this second joint venture, and EBR continued to make payments to Jay Royall's entities which were unrelated to the construction on either the first or third tower.[5] *Id.*

By the summer of 2005, Lee and Jay Royall's relationship began to deteriorate and Lee finally became suspicious of Jay Royall's activities. *Id.* at 12-13. In June, Lee finally requested that Jay Royall furnish him and EBR with complete financial information concerning the project.

---

[4]It unclear from the underlying complaint what, if anything, transpired with respect to the second condominium tower.

[5]There are a number of other allegations of improper self-dealing in the underlying complaint, including, *inter alia*, misrepresentations regarding the parties' contributions to EBR, improper loans, the use of EBR funds to build a residence in North Carolina which was eventually transferred to Jay Royall, materially false financial prospectuses which Jay Royall presented to Lee, numerous cost overruns and sundry kickbacks (*See* Doc. 42, Ex. F at 5-18).

*Id.* at 13.  In August 2005, Lee sent representatives to Orlando to make copies of the books.  *Id.*

However, the weekend before the representatives arrived, "Jay Royall and his son were filmed

removing documents from the offices[6] which, to date, have not been accounted for."  *Id.*

### 2.  Underlying Allegations Concerning the Sale of Emerald Beach Resort Condominiums

In addition to providing for the actual construction of the Emerald Beach Resort, Jay

Royall also assured Lee that he would be responsible for the sale and marketing of the project's

condominiums.  To market the condominiums, Jay Royall entered into a listing agreement,

putatively on behalf of EBR, with Riverfront Equities (a company owned and controlled by Jay

Royall and his son which is also a Nationwide insured).  *Id.*  As with the construction agreements,

the material terms of the listing agreement were not disclosed to Lee.  *Id.* at 14.  However,

Riverfront Equities was to receive a commission from EBR, ranging from five to eight percent, for

the sale of each condominium.  *Id.*  After EBR had entered into the listing agreement, Riverfront

Equities began marketing the condominiums out of a Longwood, Florida office which was leased

to EBR.  *Id.* at 15.  Riverfront also marketed the condominiums from an office located on-site in

Panama City Beach.  *Id.*

In early 2004, Riverfront began selling EBR's condominiums to its own principals and

employees.  *Id.*  Riverfront sold four or five condominiums directly to Jay Royall's son and one of

Riverfront's salespersons for as little as ten dollars ($10.00) down, despite the fact that each sale

---

[6]Other than stating that this office was located in Orlando, the Complaint fails to allege exactly
to whose office Lee's representatives were sent, or whose documents were allegedly removed from
that office.  For purposes of this Order, however, the Court has assumed, consistent with the
Defendants' contentions (*see* Doc. 53 at 16) and a fair reading of the entire underlying complaint, that
the office in question belonged to or was leased to EBR.

required a down payment of at least twenty percent (20%).  *Id.*  Jay Royall allegedly signed the sale agreements for these transactions on behalf of EBR.  *Id.*

Lee's concerns regarding the improper construction transactions also extended to Riverfront's marketing efforts, and by the summer of 2005 things began to unravel on that front as well.  At approximately the same time in June or August 2005, when Lee began to request an accounting of the construction transactions, Joe Royall instructed Riverfront Equities' staff to remove or destroy all documents from the Panama City Beach office and to erase all hard drives. More specifically:

> The sales staff in Panama City Beach were seen throwing documents and other property into the dumpster, and placing computers and other documents in their cars.  Additionally, Jay and Joe Royall and other personnel where seen removing documents and other property from the sales office in Orlando.  Upon information and belief, the documents and other property which Royall instructed his staff to take or destroy had been paid for by, and were the property of, [EBR].

*Id*. at 15-16.

### 3.  Summary of Allegations from the Underlying Action Pertinent to the Instant Coverage Dispute

The parties agreed at oral argument that coverage turns on the following set of allegations in the underlying complaint: (1) the removal of documents by Jay and Joe Royall from an unidentified Orlando office (which the Court has assumed was an office owned or leased by EBR) (*See* Doc. 42, Ex. F at ¶ 56); (2) the below-market sale of EBR's condominiums to Joe Royall and a Riverfront salesperson (*See* Doc. 42, Ex. F at ¶ 66); and (3) the throwing of EBR's documents and other property into the dumpster, the placing of computers and other documents in employees' cars, and the erasure of computer hard drives by Riverfront's Panama City Beach staff at the direction of Joe Royall (*See* Doc. 42, Ex. F at ¶ 68).

### C.  Relevant Insurance Policy Provisions

Between 2001 and 2006, Nationwide issued sixteen (16) separate insurance policies to Royall Construction of Central Florida, Royall Construction of Florida I, Riverfront Equities, and Riverfront Equities Realty.[7]  While the parties did not clearly identify which policies where in effect at the time the specific set of allegations in the underlying complaint occurred, the Court has reviewed each policy, Nationwide's March 28, 2006 reservation of rights letters (which identify relevant policy provisions presumably then in effect), and Defendants' quotations from the relevant policies in their Motion for Partial Summary Judgment (Doc. 53).  To simplify matters, the Court has relied on Defendants' Motion for Partial Summary Judgment on Nationwide's Duty to Defend (Doc. 53) for the relevant policy provisions.

Each Nationwide policy provides two types of coverage: Coverage A and Coverage B.  In pertinent part, Coverage A provides:

> a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply...
>
> b.  This insurance applies to "bodily injury" and "property damage" only if:

---

[7]From February 19, 2001 through February 19, 2006, Nationwide insured Royall Construction of Central Florida through five separate policies of insurance, each of which provided coverage for one year (Doc. 42, Exs. A-1 through 5).  From May 9, 2002 through May 9, 2006, Nationwide insured Royall Construct of Florida I through five separate policies of insurance, each of which provided coverage for one year (Doc. 42, Exs. B-1 through B-5).  From November 1, 2001 through November 1, 2006, Nationwide insured Riverfront Equities through five separate policies of insurance, each of which provided coverage for one year (Doc. 42, Exs. C-1 through C-5).  Finally, from September 1, 2005 through September 1, 2006, Nationwide insured Riverfront Equities Realty through a single policy of insurance (Doc. 42, Ex. D).

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period...

"Property Damage" means:

a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b.  Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(Doc. 53 at 11-12).

In pertinent part, Coverage B provides:

a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking such damages for "personal injury" or "advertising injury" to which this insurance does not apply...

b.  This insurance applies to:

(1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you...

"Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

a.  False arrest, detention or imprisonment;
b.  Malicious prosecution;
c.  Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor...

*Id.*

-9-

The following exclusions are also contained in the Nationwide policies:[8]

This insurance policy does not apply to:

a.  Expected or intended injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.  This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property...

j.  Damage to Property

"Property damage" to:

> (1)  Property you own, rent, or occupy;
>
> (2)  Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises.
>
> (3)  Property loaned to you;
>
> (4)  Personal property in the care, custody or control of the insured...

## II.  Standard of Review

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact.  FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994).  Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

---

[8]Because Defendants did not provide any of the exclusions in their quotations of the relevant policy provisions, the exclusions – which appear to be consistent across all sixteen policies – were taken from the February 19, 2002 policy issued to Royall Construction of Central Florida, Inc.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted).  Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id*. at 322, 324-25; *Watson*, 252 F.Supp.2d at 1352.  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

With respect to determining an insurer's duty to defend, summary judgment is generally appropriate inasmuch as the construction and effect of a written contract are matters of law to be determined by the Court.  *See, e.g.*, *Northland Cas. Co. v. HBE Corp.*, 160 F.Supp.2d 1348, 1357-58 (M.D. Fla. 2001)("Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely upon the applicability of the insurance policy, the construction and effect of which is a matter of law.") (citations omitted).

### III.  Analysis

#### A.  Duty to Defend

Under Florida law, an insurer's duty to defend is distinct from and broader than the duty to indemnify.  *Lime Tree Village Cmty. Club Ass'n, Inc. v. State Farm Gen. Ins. Co.*, 980 F.2d 1402, 1405 (11th Cir. 1993) [hereinafter *Lime Tree*] (citing *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So. 2d 810, 813-14 (Fla.. 1st DCA 1985)).  The duty to defend is determined by examining the allegations in the underlying complaint filed against the insured.  *Id.* (citing *Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So. 2d 533, 536 (Fla. 1978)); *see also State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1077 n. 3 (1998).  The insurer must defend when the complaint alleges facts which fairly and potentially bring the suit within policy coverage.  *Id.* (citing *Trizec Properties, Inc. v. Biltmore Const. Co.*, 767 F.2d 810, 811-12 (11th Cir. 1985); *Baron Oil Co.*, 470 So. 2d at 815).  "[I]f the underlying [complaint] alleges facts showing two or more grounds for liability, one being within the insurance coverage and the other not, the insurer is obligated to defend the entire suit."  *Id.* (quoting *Baron Oil Co.*, 470 So. 2d at 813-14).  Furthermore, "If the allegations of the complaint leave any doubt as to the duty to defend, the question must be resolved in favor of the insured."  *Id.* (citing *Trizec Properties, Inc.*, 767 F.2d at 812; *Baron Oil Co.*, 470 So. 2d at 814).

#### 1.  Removal of Documents from Orlando Office

Defendants contend that Jay and Joe Royall's removal of EBR's documents from EBR's office in Orlando brings the underlying action within Coverage A's protections against property damage (Doc. 53 at 16).  As a threshold matter, however, the underlying plaintiffs do not in anyway seek relief for Jay or Joe Royall's removal or destruction of EBR's documents.  Indeed,

however one might label the particular claims for relief asserted in the underlying complaint, the factual allegation that Jay and Joe Royall improperly removed or destroyed EBR's documents does not form the predicate for any of the relief sought in the underlying complaint.[9]  On the contrary, plaintiffs seek relief for the economic harm occasioned by the Royall's improper financial transactions and self-dealing – not the destruction of personal property.  Far from the gravamen of the underlying complaint, then, the allegations of document removal or destruction appear to show only that the Royalls tried to cover their tracks once Lee finally suspected something might have been amiss and requested to see the books.

Even assuming, *arguendo*, that the underlying complaint did seek relief for property damage, the Royall's removal or destruction of EBR's documents falls squarely within the policy's intentional act exclusion.  As Nationwide argues, from the standpoint of the insureds, the Royalls' act of removing or destroying documents was clearly "expected" or "intended."  Defendants, however, parry that the Royalls may have acted under the mistaken belief that the documents in question were owned by a Royall-controlled entity and not EBR (Doc. 53 at 17).  Thus, should it turn out at trial that EBR, in fact, owned the documents, then the consequences of the Royalls' actions will have been "neither expected nor intended" from the standpoint of the insureds.  While clever, Defendants' argument nevertheless misses it mark.

---

[9]Defendants suggest that *Lime Tree* requires the Court to assess whether the insured could be held liable under *any* theory of liability given the facts pled in the complaint (*see* Doc. 66 at 7).  While the Court agrees that the particular labels applied to the claims asserted in the complaint should be disregarded, and that the Court must instead carefully examine the facts actually alleged, *Lime Tree* does not go so far as to require the Court to conceive – on its own – every possible theory upon which liability could attach.  There must at least be some *potential* basis for holding the insured liable which is covered under the policy of insurance in order for insurer's duty to defend to be triggered.  *Lime Tree*, 980 F.2d at 1406.

Putting aside the fact that the complaint alleges that EBR was 50% owned by a Jay Royall-controlled entity (and thus the Orlando documents cannot, according to the complaint, have been the sole property of EBR[10]), regardless of which entity was in possessory control, the Royalls' intent was clearly to remove or destroy the specific documents in question.  Even if the Royalls' mistakenly believed they had a right to possess the documents, a fair reading of the entire complaint suggests that the documents would have been removed regardless of which entity owned them.  Thus, the Royalls' intent does not change simply because EBR might be deemed at trial to be the entity in possessory control.  Indeed, unlike the tortfeasor who shoots his intended target but the target ultimately turns out to be someone else,[11] there is no allegation in the underlying complaint that the Royalls removed or destroyed the *wrong* documents.  On the contrary, they intended to remove or destroy the documents which evidenced their improper financial transactions – regardless of which entity owned the documents.  Accordingly, the intentional act exclusion applies and there can be no coverage.

### 2.  The Improper Sale of Condominiums in the Emerald Beach Resort Project

Next, Defendants argue that the below-market sale of EBR's condominiums to Joe Royall and a Riverfront salesperson triggers Coverage B's protection against "personal injury."  As previously noted, Coverage B defines "personal injury" to include "Wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises

---

[10]In addition, then, to the intentional act exclusion, both the ownership exclusion and the care, custody and control exclusion would exclude coverage.

[11]*See, e.g.*, *Spengler v. State Farm and Cas. Co.*, 568 So. 2d 1293 (Fla. 1st DCA 1990)(holding intentional act exclusion for bodily injury did not apply to exclude coverage where homeowner shot putative burglar who ultimately turned out to be his date because harm was not intended to the date).

that a person occupies by or on behalf of its owner, landlord or lessor." Based on this language, Defendants contend that these unauthorized condominium sales deprived EBR (or at least one of the other underlying plaintiffs) of a possessory interest in their real property. Again, however, the underlying complaint does not seek – potentially or otherwise – redress for any harm occasioned by an eviction, wrongful entry or invasion of the right to occupancy. The underlying complaint seeks damages for the resultant economic harm done by the below-market sale of the condominiums.[12]

More problematically, however, the underlying complaint does not allege that an insured was involved in any of these transactions. Indeed, the underlying complaint alleges that Jay Royall, "purportedly acting as a managing member of EBR," was the seller in this transaction (*See* Doc. 42, Ex. F at 15, ¶ 66). Although Jay Royall may be considered an insured when acting on behalf an insured entity, EBR is not a Nationwide insured. Similarly, there is no allegation in the underlying complaint that Joe Royall or the Riverfront salesperson, the buyers in these transactions, were acting in anything other than their individual capacities. Apart, then, from the fact that there was no wrongful eviction or occupancy, a Nationwide insured was simply not a party to any of these transactions. Consequently, there can be no coverage for the improper condominium transactions.

---

[12]Furthermore, there is no allegation in the underlying complaint that Joe Royall or the Riverfront salesperson ever took possession of, or even occupied, any of these condominiums.

### 3. The Removal or Destruction of Documents and Hard Drives by Riverfront's Staff

Finally, Defendants argue that the throwing of EBR's documents and other property into the dumpster, the placing of computers and other documents in employees' cars, and the erasure of computer hard drives by Riverfront's Panama City Beach staff at the behest of Jay Royall are acts of property damage under Coverage A.  While similar to the property damage concerning the Orlando office, the documents and hard drives which the Riverfront staff are alleged to have removed or destroyed are alleged to have been the sole property of EBR.  Thus, the ownership or care, custody and control exclusion is inapplicable.  Again, however, regardless of which entity was in possessory control, the removal or destruction of these documents and hard drives does not form the predicate for any potential claim for relief.  More importantly, Jay Royall and his Riverfront staff clearly intended to remove or destroy the documents and hard drives in question, thus excluding these acts of property damage under the intentional act exclusion.

Based on the foregoing, none of the allegations in the underlying complaint fairly and potentially bring the suit within policy coverage.  Accordingly, Plaintiffs' Motion for Summary Judgment with respect to the duty to defend will be granted and Defendants' Motion for Partial Summary Judgment on Nationwide's duty to defend will be denied.

### B. Duty to Indemnify

Inasmuch as the Court has determined that Nationwide has no duty to defend, there can correspondingly be no duty to indemnify the Defendants.  *See*, *e.g.*, *Allstate Ins. Co. v. Safer*, 317 F. Supp. 2d 1345, 1358  (M.D. Fla. 2004); *Fun Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So. 2d 419, 422 (Fla. 3d DCA 1995).

### C.  Reimbursement for Attorneys' Fees and Costs

Because Nationwide's policies are silent with respect to the recovery of attorneys' fees and costs in the event Nationwide defends a suit for which it is later determined there is no duty to defend, Nationwide relies on its reservation of rights as the basis for reimbursing its fees and costs. As previously noted, Nationwide sent three reservation of rights letters to Defendants.  Only the last of these three letters, which was sent on March 28, 2006, asserted Nationwide's right to recover fees and costs incurred in defense of the underlying lawsuit.  Approximately two months prior to first asserting its right to be reimbursed, however, Nationwide had advised its insureds that it was undertaking the defense of the underlying suit on their behalf and that it had retained counsel to do so (Doc. 53, Ex. C).[13]

In the last eight years, Florida courts appear to have joined the majority of other jurisdictions[14] which permit insurers to recover costs and fees expended on behalf of an insured where there has been no duty to defend but the policy is nevertheless silent as to reimbursement. *See Jim Black & Assocs., Inc. v. Transcontinental Ins. Co.*, 932 So. 2d 516 (Fla. 2d DCA 2006); *Wendy's of N.E. Fla., Inc. v. Vandergriff*, 865 So. 2d 520 (Fla. 1st DCA 2003); *Colony Ins. Co. v. G&E Tires & Serv., Inc.*, 777 So. 2d 1034 (Fla. 1st DCA 2000).  However, as evidenced by both

---

[13]Notwithstanding the fact that its insured had previously hired a different attorney, Nationwide selected counsel of its own choosing.  While the insureds apparently acquiesced in Nationwide's choice, the parties did not mutually agree upon counsel at the time Nationwide first included the right to be reimbursed in its third reservation of rights.

[14]*See Cincinnati Ins. Co. v. Grande Pointe, LLC*, 501 F. Supp. 2d 1145, 1161 (E.D. Tenn. 2007)(collecting cases and observing that a majority of jurisdictions permit recovery of fees and costs where the insurer has no duty to defend even if the policy does not contain an express provision regarding reimbursement).

parties' reliance on these three decisions in their respective motions, Florida is still clarifying this area of the law.

In the *Colony* decision, the First District Court of Appeals held that an insurer is entitled to reimbursement where the insured accepts mutually agreeable counsel on the condition that it reimburse the insurer should there ultimately be no duty to defend.  *Colony Ins. Co.*, 777 So. 2d at 1039.  In reaching its holding, the *Colony* Court made three important observations: (1) by accepting an insurer's offer to defend the suit, an insured necessarily agrees to the terms upon which the insurer offers the defense; (2) where the insurer and insured have selected mutually agreeable counsel, the insured will be no worse off if it is responsible for its attorneys' fees and costs in the event there is no duty to defend since the insured would been responsible for paying those costs to the same attorney anyway; and (3) an insured cannot accept an insurer's tendered performance while unilaterally altering the material terms on which the performance is offered.  *Id.* at 1036 and 1039.

In the *Wendy's* decision, however, the Court clarified that an insurer could not unilaterally assert a right to reimbursement after having already agreed to defend its insured pursuant to a reservation of rights which made no mention of a right to reimbursement.  *Wendy's of N.E. Fla., Inc.,* 865 So. 2d at 522.

Lastly, in *Jim Black*, the Court re-affirmed its view that where a reservation of rights includes on offer to defend using mutually agreeable counsel but on the express condition that the insured be given a right to reimbursement, the insurer is entitled to reimbursement where the insured accepts the offered defense and there is ultimately no duty to defend.  *Jim Black & Assocs., Inc.*, 932 So. 2d at 518.

The common thread throughout these three decisions is that, fundamentally, the relationship between an insurer and an insured is governed by the law of contracts.  With respect to reimbursement of fees and costs, in particular, Florida courts appear to require the formation of a separate agreement between the insurer and insured before the insurer will be entitled to recover its fees and costs.  Indeed, as the *Wendy's* decision makes clear, an insurer cannot, by a general reservation of rights which makes no mention of reimbursement, retroactively recover fees and costs without having first provided reasonable notice to the insured.  Instead, the insured must first make an offer which the insured, in turn, accepts (i.e., the insurer and insured must first agree that the insurer will continue to front the fees and costs of the underlying litigation with the understanding that, should there ultimately be no coverage, the insurer will have the right to recover its fees and costs).[15]  Only at that point, as the *Colony* and *Jim Black* decisions found, have the parties formed a separate agreement upon which the insurer may be entitled to reimbursement.

In this case, the insured simply said nothing after the March 28, 2006 letter.  As a result, the insurer apparently claims acceptance by acquiescence.  Whether acceptance of a contract may be inferred from acquiescence, however, has long plagued Florida's jurisprudence.  *See*, *e.g.*, *Kaskisto v. N. Am. Equitable Life Assur. Co.* (Fla. 3d DCA 1981)(failure to object to altered mortgage rate schedule conflicted with general principle of law that silence does not constitute acceptance); *Kanter v. Safran*, 68 So. 2d 553, 559 (Fla. 1953)(finding implied acceptance of lessor's offer to re-take premises for lessee's account upon lessee's relinquishment of premises);

---

[15]Whether the parties must select mutually agreeable counsel, however, is an open question. While the better course would appear to be selection of mutually agreeable counsel, the Court need not address this issue.

*Summerall v. Thomas*, 3 Fla. 298, 1850 WL 1229 at *12 (Fla. 1850)(noting that "The omission to disaffirm a contract within a reasonable time, has been held sufficient evidence of a ratification... 'Acquiescence merely for an unreasonable time is an act that denotes an intent not to rescind the contract.'") (citations omitted).  In the limited circumstances in which acquiescence may constitute acceptance, the law appears to require, at a minimum, that there at least be some reasonable time for the offeree to reject the offer before acquiescence will be deemed an acceptance.[16]

Neither the *Colony* nor the *Jim Black* decision addresses the reasonableness of the time required for the insured to reject the insurer's offer before the insured's acquiescence will be deemed an acceptance.  Both courts simply appear to have implicitly assumed that the insured had accepted the insurer's offer.  In the absence of any controlling Florida authority on point, the Court anticipates that the Florida Supreme Court would require that some reasonable time elapse before the insured's acquiescence constitutes an acceptance.  Based generally on the relationship of insurers and insureds, and notwithstanding the sophistication (or lack thereof) of the insured, the insurer should be required to give the insured a specific, reasonable time (e.g., fifteen days) within which to accept or reject a written offer of a defense conditioned upon the reimbursement of fees and costs.  Where this written offer clearly and expressly states that the failure to reject the offered defense within the stated period will constitute an acceptance, the insurer will be entitled to

---

[16]*See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)("...Where an offeree fails to reply to an offer, his silence and inaction operate as an acceptance in the following cases *only*: (a) Where an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation.  (b) Where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer...") (emphasis added).

reimbursement in the event the insured fails to object and it is later determined that there is no

coverage under the policy.

In the instant case, there is no evidence that the insureds ever accepted Nationwide's March

28, 2006 offer to defend the underlying action upon the condition that Nationwide would have the

right to be reimbursed for its attorneys' fees and costs in event there was no coverage.  To be sure,

Nationwide clearly provided the insureds with a defense after the third reservation of rights letter.

However, absent express notice that a failure to object would constitute an acceptance, the

insured's acquiescence in Nationwide's offered does not constitute an acceptance.  Consequently,

there was no agreement to reimburse Nationwide for its fees and costs.

IV.  **Conclusion**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc. 55) is **GRANTED in part** and **DENIED in part**.  Defendants' Motion for Partial Summary Judgment on Nationwide's Duty to Defend (Doc. 53) is **DENIED**.  Defendants' Motion for Partial Summary Judgment on Nationwide's Right to Reimbursement (Doc. 54) is **GRANTED**.

It is further **ORDERED** that the Clerk of the Court shall enter judgment in favor of Plaintiffs, Nationwide Mutual Fire Insurance Company and Nationwide Mutual Insurance Company, declaring that Plaintiffs have no duty to defend or indemnify Defendants in the State court action styled *Emerald Beach Resort, LLC v. Hardin J. Royall*, Case No. 05-2908-CA, Fourteenth Judicial Circuit, in and for Bay County, Florida.  The judgment shall further provide that Plaintiffs will be entitled to collect only those costs allowed by 28 U.S.C. § 1920.  The Court reserves jurisdiction to enter a cost judgment.

The Clerk is directed to close the case and terminate any remaining motions.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on October 28, 2008.

Copies furnished to:

Counsel of Record
Unrepresented Party

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE